**In the Matter of Junior C. REED.**
**No. 11.**

United States District Court
D. Delaware.

Jan. 20, 1956.

Henry A. Wise, Jr. (of Wise & Suddard), Wilmington, Del., and Doris P. Scott, Elkton, Md., for petitioner.

Leonard Hagner, U. S. Atty., H. Newton White, Jr., Asst. U. S. Atty., Wilmington, Del., and Joseph J. F. Clark, Major, USAF, Washington, D. C., for respondent.

WRIGHT, District Judge.

The matter before the court is a Writ of Habeas Corpus directed to Captain Doris Beam, U.S.A.F. 82 Fighter Group Defense, New Castle Airport, Delaware. Captain Beam is the Provost Marshal and Confinement Officer who was charged with the custody of the petitioner, Junior C. Reed.[1]

The sole question presented is whether the petitioner, Reed, is a member of the United States Air Force.

The petitioner enlisted in the United States Air Force on August 12, 1952, to serve for a period of four years. On March 25, 1954, in accordance with the procedure set forth in the Uniform Code of Military Justice,[2] he was tried and convicted by a general court-martial. The sentence of the court-martial tribunal was that petitioner be discharged from the service with a bad conduct discharge, forfeit $50 of his pay per month for twelve months, and be confined at hard labor for one year.[3] Upon review by the appropriate military authority the record of the court-martial was determined to be

---

1. At the conclusion of the hearing on the Writ petitioner was admitted to bail pursuant to application made by Reed's attorneys. See Johnston v. Marsh, 3 Cir., 1955, 227 F.2d 528.

2. 50 U.S.C.A. §§ 551–741.

3. Respondent's Exhibit B; Transcript of Hearing, p. 14.

sufficient to support the finding of guilty and the sentence of the court-martial.[4] Execution of the sentence was authorized by the appropriate authority after conviction and sentence became final on September 9, 1954.[5] On September 20, 1954, while serving his sentence, the petitioner was discharged from the Air Force with a bad conduct discharge pursuant to the sentence of the court-martial.[6] It also appears that while serving his sentence pending final review, the petitioner signed a waiver of parole on August 24, 1954. In signing the waiver of parole, petitioner indicated he desired to serve the remainder of his sentence rather than be released on parole unless he could be restored to duty.[7]

Thereafter on September 10, 1954, while serving his sentence in confinement, he applied for restoration to duty to earn a discharge under honorable conditions. Attached to this application for restoration to duty was an affidavit signed by the petitioner, which, among other things, contained the following statement:

"I understand that my discharge and my *enlistment* will be predicated upon the truth of the statements contained in this affidavit."[8]

The application of the petitioner to be restored to duty was approved by the Secretary of the Air Force on October 26, 1954, and as provided in situations where the prisoner has an executed punitive discharge, the unexpired portion of the petitioner's court-martial sentence was remitted and his enlistment in the Air Force as a basic airman for a period of three years was authorized.[9] The petitioner was notified of this action on November 1, 1954 and was shown a letter remitting the balance of his sentence and authorizing his enlistment for three years.[10] On the same date an order was published by Headquarters, Branch United States Disciplinary Barracks, Lompoc, California, remitting the unexecuted portion of the sentence, restoring the petitioner to duty effective November 4, 1954, and directing him to proceed to Lackland Air Force Base, Texas for processing and reassignment in transportation to be furnished by the transportation officer.[11]

From the testimony and examination of the exhibits in evidence it further appears petitioner reported for duty at Lackland Air Force Base in accordance with military orders on or about November 11, 1954.[12] He remained there in a duty status until December 15, 1954, on which date he went home on fifteen days leave,[13] and while on leave wired for an extension which was granted.[14] Petitioner remained in a leave status until January 3, 1955, on which date he reported to the Commander of the 1607th Air Transportation Wing, Dover Air Force Base, Delaware, and due to lack of funds requested military transportation back to his station at Lackland Air Force Base. Transportation together with meal tickets was furnished by the Air Force[15] on the basis of representations by Reed that he was a member of the Air Force. Arriving at Lackland Air Force Base, Texas on January 5, 1955, petitioner remained there in duty status until March 27, 1955. On March 28, 1955, petitioner went ab-

4. Respondent's Exhibit C.

5. Respondent's Exhibit D.

6. Petitioner's Exhibit 3; Transcript of Hearing, pp. 13, 15.

7. Respondent's Exhibit E.

8. Respondent's Exhibit F; Transcript of Hearing p. 14; emphasis added.

9. Respondent's Exhibit T; Air Force Manual, 125–2, Ch. 7, Sec. III, par. 8e; Respondent's Exhibit I.

10. Respondent's Exhibit I; Transcript of Hearing p. 15.

11. Respondent's Exhibit J.

12. Respondent's Exhibit K.

13. Respondent's Exhibit K; Transcript of Hearing p. 7.

14. Transcript of Hearing p. 19.

15. Respondent's Exhibit L; Transcript of Hearing pp. 19–20.

sent without leave,[16] but returned on March 29, 1955, only to leave Lackland without authority on April 6, 1955.[17] After being absent for thirty days, Reed was carried on the Air Force roll as a deserter[18] and was classified as such when apprehended.

While at Lackland Air Force Base, the petitioner lived in Air Force barracks provided for men who had finished training and were awaiting reassignment;[19] ate in Air Force mess halls;[20] performed the duties which were assigned to him;[21] wore an Air Force fatigue uniform;[22] possessed a class "A" pass;[23] and received Air Force pay and uniform allowance[24] until absenting himself without leave on April 6, 1955.[25] While home on leave petitioner married[26] and upon his return applied for and was granted an allotment for his wife.[27] In February, 1955, the petitioner was hospitalized at his base for a period of approximately twenty days during which time an appendectomy was performed.[28]

Upon the petitioner's release from confinement at the Disciplinary Barracks at Lompoc, California no adequate records were prepared. In addition, Headquarters at the Disciplinary Barracks neglected to have Reed sign an enlistment form. Faced with inadequate records, and the question as to who should prepare the needed records,[29] the petitioner's Commanding Officer contacted "higher headquarters"[30] and was advised early in March of 1955 that the petitioner should be enlisted as of November 4, 1954.[31] The petitioner was advised of this[32] either on March 15, 1955 or shortly before that date, and on March 15, 1955 declined to sign an enlistment form and indicated his refusal in writing.[33] The petitioner was advised that further inquiry would be made as to his status in view of his refusal to sign the enlistment forms as requested by his Commanding Officer on March 15, 1955.[34]

Petitioner asserts Captain MacKillop, his Commanding Officer at Lackland Air Base, gave him his bad conduct discharge on or about March 15, 1955, and that he had not received the bad conduct discharge prior to that time. In addition, petitioner claims that on or about the alleged date of receipt of the discharge, his Commanding Officer told him, that as far as he was concerned, the petitioner was a civilian.

There is no doubt in my mind, however, that the petitioner was given his discharge upon his release from confinement at the United States Disciplinary Barracks at Lompoc, California, in the light of the petitioner's admission that he signed for his bad conduct discharge while serving his sentence in confinement,[35] and the testimony that the usual procedure followed in such cases is to deliver bad conduct discharges upon release from confinement.[36] I have also been influenced somewhat in reaching this con-

16. Respondent's Exhibit M–2; Transcript of Hearing p. 57.

17. Respondent's Exhibits Q–1, Q–2; Transcript of Hearing p. 58.

18. Respondent's Exhibit Q–2; Transcript of Hearing p. 58.

19. Transcript of Hearing p. 82.

20. Respondent's Exhibits N–2, N–3; Transcript of Hearing, p. 11.

21. Transcript of Hearing pp. 5, 60.

22. Respondent's Exhibit N–1; Transcript of Hearing p. 5.

23. Transcript of Hearing p. 83.

24. Respondent's Exhibit O; Transcript of Hearing p. 88.

25. Respondent's Exhibit O.

26. Transcript of Hearing pp. 7, 21, 92.

27. Respondent's Exhibit O; Transcript of Hearing pp. 8, 21, 46.

28. Transcript of Hearing pp. 46–47.

29. Transcript of Hearing pp. 45–46, see also Respondent's Exhibit P.

30. Transcript of Hearing p. 45.

31. Transcript of Hearing p. 47.

32. Transcript of Hearing pp. 47–48.

33. Respondent's Exhibit S; Transcript of Hearing pp. 48–50.

34. Transcript of Hearing p. 52.

35. Transcript of Hearing p. 13.

36. Transcript of Hearing p. 96.

clusion by the testimony of the petitioner's Commanding Officer, that he did not recall seeing the petitioner's bad conduct discharge [37] and his statement that he did not tell the petitioner he considered him a civilian.[38]

In order to complete the factual background of this unfortunate situation, it should be stated that at all times the Commanding Officer of the petitioner considered the petitioner to be a member of his organization.[39] Also, in response to inquiry through military channels a communication was received on May 5, 1955 from Headquarters, United States Air Force stating that the Air Force considered petitioner as being constructively enlisted in the Air Force as of November 4, 1954.[40]

There is one additional fact which must be taken into consideration, namely, that the petitioner in his traverse to the return of the Writ of Habeas Corpus admits that the petitioner, Junior C. Reed, is chargeable with knowledge of the provisions of the Air Force Manual,[41] the pertinent provisions of which read as follows:

> "e. A prisoner under sentence which includes an executed punitive discharge will be restored by—
>
> "(1) Remission or suspension of the unexecuted portion of the sentence, and
>
> "(2) Reenlistment in the Air Force for a term of 3 years." [42]

In view of the facts as outlined herein, I have with some degree of reluctance concluded that the petitioner was constructively enlisted as a basic airman in the United States Air Force as of November 4, 1954. The petitioner was not a raw recruit or enlistee, but had served a part of his original enlistment of four years and was within the jurisdiction of

the Armed Services on November 4, 1954, at which time he was released from confinement. If the petitioner at the time of his release, by any word or act, had indicated he was not a member of the United States Air Force or did not consider himself to be a member of the Air Force, he would have been returned to confinement to serve the balance of his sentence unless paroled in accordance with military law and procedure. From the moment petitioner was released from confinement until March 15, 1955 when he declined to sign an enlistment form, he apparently obeyed all orders, and considered himself entitled to all of the benefits and prerogatives afforded any other basic airman enlistee whose records had been lost or were incomplete.

It is difficult to believe that petitioner was without knowledge of his duty to reenlist for three years in view of the following salient facts: petitioner procured his release from confinement on the condition that he reenlist; petitioner applied for reenlistment and signed a paper containing a reference to a three year enlistment; petitioner admitted he considered himself a member of the Air Force as late as January 3, 1955;[43] and finally, it is admitted that petitioner was chargeable with knowledge of the Air Force regulations which make reenlistment mandatory as a condition for release from confinement.

Petitioner's conduct in applying for leave, and asking for an extension thereof, requesting transportation from Dover Air Force Base to his station in Texas, applying for an allotment for his new bride, performing the duties assigned him, and accepting Air Force pay, would indicate the petitioner had no doubt as to his status as a member of the Air Force. Nor did the Air Force ever express any doubt as to his status other than to sub-

37. Transcript of Hearing pp. 50, 67.

38. Transcript of Hearing p. 51.

39. Transcript of Hearing p. 65.

40. Respondent's Exhibit P; Transcript of Hearing p. 52.

41. Respondent's return to Writ of Habeas Corpus, par. VIII and petitioner's traverse to the Return of the Writ, par. 1.

42. Air Force Manual, 125–2, Ch. 7, Sec. III, par. 8e (Respondent's Exhibit T).

43. Transcript of Hearing p. 20.

mit a request for clarification of status because of the inadequate records of petitioner. That the Air Force considered Reed to be among its membership is shown by its permitting Reed to eat in the Air Force mess, sleep in an Air Force barracks, wear an Air Force fatigue uniform and receive Air Force hospitalization. In addition, Reed was the recipient of a class "A" pass and was carried on the duty roster in full pay status until he went absent without leave on April 6, 1955. In brief, the Air Force treated petitioner as any other enlistee with inadequate records awaiting reassignment.

It is clear, inadequate records were prepared upon the petitioner's release from confinement. Petitioner certainly did not sign an enlistment record or receive a mental or physical examination, except possibly a physical examination prior to his appendectomy in February of 1955. However, upon the facts as developed, the failure of the Air Force to give petitioner a physical and mental examination, and failure to compel petitioner to sign a re-enlistment form upon his release from confinement does not control. The conduct of the petitioner and the Air Force subsequent to November 4, 1954, the date petitioner was released from confinement, either cures or waives any failure or neglect on the part of the Air Force insofar as adequacy of records, giving of a mental and physical examination, and signing of an oath of enlistment are concerned.[44]

In the light of all that occurred, and all that was done by the petitioner and the Air Force after the petitioner's release from confinement until the date the petitioner absented himself without leave on April 6, 1955, there was a constructive enlistment.[45] The petitioner and the Air Force have by their conduct assumed duties and responsibilities to each other which cannot be dissolved except by the mutual consent of the parties. If the petitioner had a change of heart on or about March 15, 1954, the date he refused to sign an enlistment record, it was too late. The petitioner had voluntarily accepted the benefits and assumed the obligations incident to membership in the Air Force, under conditions and circumstances which clearly indicate that the petitioner knew, or should have known, that such membership was for a three year reenlistment period.

The Writ of Habeas Corpus will therefore be dismissed and the petitioner remanded to the custody of the United States Air Force.

An order in conformity herewith may be submitted.

44. Mayborn v. Heflebower, 5 Cir., 1944, 145 F.2d 864; Hibbs v. Catovolo, 5 Cir., 1944, 145 F.2d 866.

45. See McFarland v. Zuppann, D.C.M.D. Pa.1949, 82 F.Supp. 526.